UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------X

UNITED STATES OF AMERICA

            -against-

ILYA KOGAN,

                   Defendant.

-----------------------------------------X

16 Cr. 221 (RWS)
17 Cr. 541 (RWS)

SENTENCING
OPINION

**Sweet, D.J.**

On March 16, 2018 Ilya Kogan ("Defendant" or "Kogan")
pleaded guilty to one count of conspiring to commit health care
fraud in violation of 18 U.S.C. § 1349 and one count of health
care fraud in violation of 18 U.S.C. § 1347. On June 25, 2018,
Kogan allocuted to one count of conspiring to commit mail fraud
in violation of 18 U.S.C. § 1349. Based on the conclusions set
forth below, Kogan will be sentenced to 60 months' imprisonment,
subject to the scheduled sentencing hearing on February 12,
2019.

1

## Prior Proceedings

## 16 Cr. 221 (RWS) ("Health Care Fraud Scheme")

Kogan was named in a two-count superseding indictment filed in the Southern District of New York on February 14, 2018. Count One charges that from at least January 2010 through August 2013, Kogan and others conspired to commit health care fraud, in violation of 18 U.S.C. § 1347, by executing a scheme to defraud the health care benefit programs Medicare and Medicaid in connection with the delivery of and payment for health care benefits, items, and services. Count Two charges that from at least January 2010 through August 2013, in the Southern District of New York and elsewhere, Kogan, in order to fraudulently obtain payments from Medicare and Medicaid to which he was not entitled, submitted numerous false claims and supporting documentation for physical therapy services and related medical items purportedly provided to beneficiaries by qualified persons, but were instead provided by unlicensed, unsupervised or otherwise unqualified persons, or were billed to reflect different or additional services than those that were actually provided.

On March 16, 2018, Kogan appeared before this Court
and pleaded guilty to his criminal conduct as charged, pursuant
to a written plea agreement.

**17 Cr. 541 (RWS) ("Mail Fraud Scheme")**

Kogan was named in a one-count indictment filed in the
Southern District of New York on August 30, 2017. Count One
charges that from at least March 2014 through June 2016, in the
Southern District of New York and elsewhere, Kogan and others
conspired to commit mail fraud, in violation of 18 U.S.C. §
1341.

On June 25, 2018, Kogan appeared before the Honorable
Kevin N. Fox and allocuted to his criminal conduct as charged,
pursuant to a written plea agreement that superseded the Health
Care Fraud Scheme plea agreement and included stipulated
Guidelines for both schemes.

Kogan is scheduled to be sentenced on February 12,
2019.

**The Sentencing Framework**

3

In accordance with the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and the Second Circuit's decision in *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005), the sentence to be imposed was reached through consideration of all of the factors identified in 18 U.S.C. § 3553(a), including the Advisory Guidelines. Thus, the sentence to be imposed here is the result of a consideration of:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed —

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for —

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines . . .;

(5) any pertinent policy statement [issued by the

4

Sentencing Commission];

   (6)  the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

   (7)  the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). A sentencing judge is permitted to find all the facts appropriate for determining a sentence, whether that sentence is a so-called Guidelines sentence or not. *See Crosby*, 397 F.3d at 114-15.

## The Defendant

The Court adopts the facts set forth in the Presentence Investigation Report ("PSR") with respect to the Defendant's personal and family history.

## The Offense Conduct

The Court adopts the facts set forth in the PSR with respect to the offense conduct. These facts are summarized, in brief form, below.

## Health Care Fraud Scheme

The investigation that led to Kogan's indictment in the Health Care Fraud Scheme was conducted by the Federal Bureau of Investigation ("FBI") and the Office of Inspector General of the U.S. Department of Health and Human Services ("HHS-OIG").

Medicare is a federal health care program that provides benefits to persons who are over the age of 65 or disabled. Medicaid is a program funded by both the federal government and the State of New York that provides benefits to individuals and families who meet financial and other eligibility requirements. Individuals can qualify as both Medicare and Medicaid beneficiaries in the event that they met the eligibility requirements for both programs. Medicare and Medicaid are each considered "health care benefit programs," as defined by 18 U.S.C. § 24(b).

One component of Medicare, referred to as "Part B," covers the costs of physicians' services and outpatient care, such as physical therapy, occupational therapy, and diagnostic tests. Medicare covers those costs only if, among other requirements, they are medically necessary and ordered by a physician. Medicaid has similar requirements.

Under the Medicare and Medicaid regulations, a medical provider is permitted to submit reimbursement claims for services actually rendered and is required to maintain patient records verifying the provision of services. By submitting the claim, the provider is certifying that the services were rendered to the patient and were medically necessary. In addition, for a provider to obtain reimbursed for a medical service, including physical therapy, from Medicare and/or Medicaid, the provider must complete a "Superbill." The Superbill contains specific "procedure codes" and "diagnosis codes" that correspond to the services rendered by the provider. A Superbill also contains the number of "billing units" corresponding to each procedure code, *i.e.*, the amount of time the physical therapy provider spent performing different types of physical therapy on a patient. Medicare and Medicaid reimburse different procedure codes at different rates of reimbursement, and the reimbursement amount increases as the number of billing units increases. Medicare and Medicaid regulations also require providers seeking reimbursements to accurately and completely document beneficiaries' medical records, thus creating what are known as "patient notes." The programs may request these patient notes as backup documentation in order to support a particular reimbursement claim or in the event of an audit.

Acupuncture is not considered a medically necessary service, and Medicare reimbursement for acupuncture may therefore not be made. Acupuncture is only reimbursed by Medicaid in New York City in very rare circumstances. Under Medicare and Medicaid, physical therapy may only be administered by individuals that have received the appropriate licenses to provide these services to patients, and claims submitted for physical therapy that were administered by individuals lacking the appropriate license will not be reimbursed.

A Small Business Administration loan application submitted on December 9, 2010 on behalf of Ashraf Hasan-Hafez ("Hasan-Hafez") and Kogan revealed that Hasan-Hafez was the listed owner of a physical therapy practice, Excellent Care Physical Therapy, P.C., which operated at 1684 East 18th Street in Brooklyn. Kogan was the owner of an acupuncture company, Zen Acupuncture, which also operated its practice out of the East 18th Street clinic and shared space with Hasan-Hafez's physical therapy clinic.

In early 2012, the FBI and the HHS-OIG began an investigation involving the East 18th Street clinic after receiving an anonymous letter asserting that the clinic was

engaging in fraud by performing services, including acupuncture, which were not covered by Medicare, and then submitting Medicare reimbursement claims falsely stating that covered services had in fact been provided.

Throughout the investigation, case agents learned that Kogan ran the clinic on a day-to-day basis, served as the head acupuncturist at the clinic, and had employees who reported to him. Agents also learned through confidential witnesses that the services provided at the clinic were predominantly massage therapy and acupuncture. The staff at the clinic included a part-time doctor or physician's assistant who provided referrals and who, on occasion, worked on premises. Whenever a patient arrived at the clinic without an order or referral for physical therapy from an outside doctor, the patient was directed to this doctor or physician's assistant, who then wrote a prescription for physical therapy and indicated it as the necessary treatment. The doctor or physician's assistant would then direct the patient to the acupuncturist or physical therapist. The clinic required patients to see this doctor or physician's assistant roughly once each month, regardless of need, in order to continue receiving massage and/or acupuncture services from the clinic.

Shortly after beginning employment at the clinic as a licensed physical therapist, one of the confidential witnesses ("CW-1") was instructed by a member of the clinic's billing department to sign a National Provider Identifier application. CW-1 was informed by Kogan that the clinic's practice would not be billed to Medicare and Medicaid under CW-1's individual name, but rather under the clinic's group provider number. However, Medicare and Medicaid billing records reveal that the clinic actually listed CW-1 as the rendering provider for a signification portion of the billing from the clinic. Additionally, CW-1 received pressure from Kogan to add information to Superbills and patient notes indicating that physical therapy services were provided to patients that were, in fact, never provided. Kogan informed CW-1 that the clinic needed to add those additional procedure codes to the Superbills because the clinic was struggling and needed money. Kogan also instructed CW-1 to add additional billing units to the Superbills and corresponding patient notes to reflect that CW-1 had spent more time providing physical therapy to a given patient than had, in actuality, been provided. Kogan further directed CW-1 to complete patient notes and Superbills for patients who solely received acupuncture to instead reflect that the patients had received physical therapy.

Around February 2013, the clinic ran an advertisement in a Russian newspaper with circulation in New York City. The advertisement included a photograph of Kogan and identified him as an acupuncturist at the clinic. CW-1 was only referenced in at the end of the advertisement, in a section titled "Also Working Here" that identified CW-1 as a physical therapist. The advertisement also featured comments from two patients regarding the acupuncture that they had received from Kogan. It did not contain any patient commentary regarding physical therapy. The advertisement indicated that the clinic offered transportation for patients in all five boroughs of New York City.

Several patients interviewed as part of the investigation indicated that they had received acupuncture from Kogan at the clinic. However, records revealed that the clinic submitted Medicare reimbursement claims for these patients listing procedure codes for physical therapy rather than acupuncture. The clinic billed Medicaid and Medicare for these purported physical therapy treatments and received thousands of dollars in reimbursements. In addition, the investigation revealed that some patients had received physical therapy treatment by an employee of the clinic who was not licensed in New York to provide physical therapy. Although treatment by unlicensed physical therapists is not entitled to reimbursement

under Medicare or Medicaid, the clinic billed the programs for these physical therapy services and subsequently received reimbursements for such services.

According to information furnished by the Government, Hasan-Hafez and Kogan are responsible for total intended losses to Medicare and Medicaid amounting between $1,500,000 and $3,500,000. The actual loss was calculated to be $1,297,000. Additionally, Hasan-Hafez and Kogan were both determined to play managerial roles in the offense by virtue of their positions at the clinic and their oversight over employees and the billing procedures. For example, employees who raised with Hasan-Hafez their concerns about the clinic's fraudulent billing were directed to follow Kogan's instructions.

**Mail Fraud Scheme**

The following investigation was conducted by the FBI.

Insurance companies are required under New York State Insurance Law to offer "no-fault insurance," which provides benefits to drivers and passengers of a registered and insured vehicle to obtain benefits of up to $50,000 per person for injuries sustained in an automobile accident, regardless of

12

fault. Under the no-fault law, patients can assign their right to reimbursement from an insurance company to others, such as healthcare providers, which provide treatment for their injuries. Medically necessary acupuncture services rendered by a licensed acupuncturist are also required to be covered by insurers under New York State law. No-fault insurers may withhold payment for medical services provided by healthcare providers who are, among other things, fraudulently incorporated or improperly licensed.

Billing for no-fault insurance claims may be done by either the health care providers themselves or specialized billing companies. If a billing company is used, the provider furnishes the billing company with the patient notes and billing codes associated with the treatment of patients, and the billing company uses these documents to create a No-Fault Verification of Treatment Form ("NF-3"), which is then mailed by the billing company to the relevant insurance provider for the patient. If the claim is approved, the insurer typically mails the claim payment to the healthcare provider.

To ensure the validity of no-fault insurance claims, insurers may question the injured person or their assignee (*i.e.*, the healthcare provider) in a proceeding known as an

13

Examination Under Oath ("EUO"). The witness is questioned under oath and may be represented by an attorney during the proceeding.

Additionally, under New York State law and regulations, Professional Corporations (P.C.s) may issue shares only to individuals who are both licensed to practice in that profession, and who are or have been engaged in the practice of that profession in that P.C. In other words, an owner of an acupuncture P.C. must be a licensed acupuncturist working at that specific P.C. Moreover, licensed professionals may not share fees for professional services with anyone other than a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice the same profession, or a legally authorized trainee practicing under the supervision of a licensed practitioner.

At all relevant times, Elizabeth Chidder ("Chidder") represented herself as the sole owner of "Mindful Acupuncture, P.C.," an acupuncture company incorporated on April 9, 2014, in Bronx, NY; and the sole owner of "Ko Chen Acupuncture P.C.," an acupuncture company incorporated on February 23, 2015, in Kings County, NY.

Between approximately 2014 and 2015, Mindful Acupuncture submitted approximately $39,000 in claims to the insurance company Liberty Mutual for acupuncture and related services and received approximately $21,000 in paid claims. Additionally, between 2015 and 2016, Ko Chen Acupuncture submitted approximately $47,000 in insurance claims to Liberty Mutual and received approximately $21,000 in paid claims. In total, between 2014 and 2016, Mindful Acupuncture and Ko Chen Acupuncture submitted more than $985,000 in claims to no-fault insurers (including Liberty Mutual) and received more than $425,000 in claims payments.

During the course of the investigation, agents interviewed a cooperating witness ("CW-1") who had provided billing services for Mindful Acupuncture and Ko Chen Acupuncture. CW-1 also provided billing services for clinics controlled by Kogan from approximately 2014 through 2015. During that time, CW-1 first worked at a certain billing company but, at Kogan's request, later opened CW-1's own billing company based in Brooklyn, NY ("Billing Company"). Kogan loaned CW-1 funds to pay the initial rent for the Billing Company, which was repaid to Kogan after insurance checks began to be received by the Billing Company.

CW-1 entered into a contract with Kogan which gave
Kogan 50% ownership of the Billing Company, even though the
Billing Company was incorporated in CW-1's name only. Kogan
employed a similar structure with other billing companies that
he used to bill for clinics that he controlled. The Billing
Company provided billing services for several acupuncture
practices controlled by Kogan. For example, Mindful Acupuncture
and Ko Chen Acupuncture, while nominally owned by Chidder, were
two of several acupuncture companies set up at the direction of
Kogan and controlled by Kogan. Specifically, Kogan directed how
much Mindful Acupuncture and Ko Chen Acupuncture should pay the
billing companies.

CW-1 reported that Kogan, or an individual working at
his direction, controlled the keys to the P.O. boxes of the
acupuncture practices under Kogan's control, including Mindful
Acupuncture and Ko Chen Acupuncture. Kogan was therefore able to
retrieve all of the checks mailed by insurers to the acupuncture
practices. Acupuncturists were either paid an hourly wage or a
salary out of the claims paid by insurers, but they did not keep
the full insurance payments they received, despite the fact that
they were the registered owners of the acupuncture clinics.

According to CW-1, Kogan also maintained a ledger logging all incoming revenue from insurers for the acupuncture practices he controlled. After Kogan logged in the checks he (or others under his direction) retrieved from the acupuncturists' P.O. boxes in his ledger, he distributed the checks to the acupuncturists to endorse and deposit. Because insurance checks would be written to the individual acupuncture practices (such as Mindful Acupuncture), Kogan required the acupuncturists to transmit the payments to him via checks addressed to shell corporations. For example, Chidder made checks out to sham advertising and marketing companies, with which Kogan had frequent telephone communications, that appeared to have no legitimate business but rather served to receive pass-through payments from no-fault insurance companies.

In March 2015, Liberty Mutual requested that Chidder submit to an EUO in relation to billing claims made by Mindful Acupuncture. Chidder complied with the request on March 19, 2015, and was represented by counsel for Mindful Acupuncture. After Chidder made various statements under oath during the March EUO, Liberty Mutual continued to approve claim requests made by Mindful Acupuncture.

Before the March EUO, Kogan, Chidder and CW-1 met in order to prepare Chidder for the questions she would be asked. During the meeting, CW-1 and Kogan coached Chidder as to how to lie during the EUO to avoid linking Mindful Acupuncture to Kogan.

Case agents later discovered that Chidder indeed made material misstatements during the March EUO. For example, when asked under oath about how she found and decided to rent a certain space at which Mindful Acupuncture had been located, she stated that she found the space herself. According to CW-1, however, Chidder leased the space at Kogan's direction. In addition, when asked how she had selected the billing company and accountant for Mindful Acupuncture, Chidder stated that they were local to her neighborhood and she had found them herself. Chidder actually found the accountant and the billing company through Kogan. In fact, the billing company Chidder named during the March EUO was operated out of the same location as the Billing Company at which CW-1 worked. At times, CW-1 provided billing services for Chidder's acupuncture clinics, and at other times other billers operating out of the same location but allegedly working for separate billers--all controlled by Kogan--provided the billing services for Chidder's acupuncture clinics. Chidder was also asked under oath at the March EUO

18

about the nature of her relationship with Mindful Acupuncture
and responded that she was the owner of Mindful Acupuncture. In
reality, Kogan was the true owner of Mindful Acupuncture who
collected the proceeds of the claims and allowed Chidder to keep
only a portion of the proceeds herself.

According to information furnished by the Government,
in addition to the aforementioned violation of New York State
law, Kogan also violated the terms of a settlement agreement
which he had entered into with the insurance company Geico on
September 29, 2014, in which he agreed not to submit any future
billing, either in his own name or under any entity in which he
had direct or indirect ownership or control, without first
giving notice to Geico. Kogan had also previously entered into a
settlement agreement with Liberty Mutual and, because of the
scrutiny that his name received from insurers resulting from
prior instances of suspected fraud, Kogan began using a company
registered in Chidder's name.

Kogan is responsible for total actual losses of
$293,851 to Geico and Liberty Mutual as a result of his
participation in the scheme to defraud.

## The Relevant Statutory Provisions

19

**Health Care Fraud Scheme**

For the offenses contained in Counts One and Two of
the Superseding Indictment, to which Kogan pleaded guilty, the
maximum term is ten years each. 18 U.S.C. §§ 1347, 1349. The
maximum fine is $2,594,000 per count. *Id.* A total special
assessment of $100 per count is mandatory. *Id.* § 3013. The Court
may impose a term of supervised release of not more than three
years per count. *Id.* § 3583(b)(2). The Defendant is eligible for
not less than one nor more than five years' probation per count
because the offenses are Class C felonies. *Id.* § 3561(c)(1).
Restitution is owed to Medicare in the amount of $1,073,264 and
to Medicaid in the amount of $223,736. *Id.* § 3663.

**Mail Fraud Scheme**

For the offense contained in Count One of the
Indictment, the maximum term is twenty years. *Id.* § 1349. The
maximum fine is $587,702. *Id.* A total special assessment of $100
is mandatory. *Id.* § 3013. The Court may impose a term of
supervised release of not more than three years. *Id.* §
3583(b)(2). The Defendant is eligible for not less than one nor
more than five years' probation because the offense is a Class C

20

felony. *Id.* § 3561(c)(1). Restitution is owed to Geico in the amount of $251,372 and to Liberty Mutual in the amount of $223,736. *Id.* § 3663.

**The Guidelines**

The November 1, 2016 edition of the *United States Sentencing Commission Guidelines Manual*, incorporating all Guideline amendments, applies to the offenses charged. U.S.S.G. §1B1.11. Pursuant to §3D1.2(d) of the Guidelines, all counts are grouped together for purposes of calculating the applicable Guidelines range.

The Guideline applicable to the group is U.S.S.G. §2B1.1. Pursuant to that Section, the base offense level is seven. *Id.* §2B1.1(a)(1). Because the total loss amounted to between $1,500,000 and $3,500,000, a sixteen-level enhancement is applicable. *Id.* § 2B1.1(b)(1)(I). A two-level increase is likewise warranted because the offense of conviction in the Health Care Fraud Scheme was a federal health care offense involving a Government health care program and the loss amount under subsection (b)(1) was more than $1,000,000. *Id.* §2B1.1(b)(7). An additional three-level enhancement applies because Kogan was a manager or supervisor and the offenses of

21

conviction in the Health Care Fraud Scheme involved five or more participants or was otherwise extensive. *Id.* §3B1.1(b). The Defendant has clearly demonstrated acceptance of responsibility for the offense, and a three-level sentence reduction pursuant to §3E1.1(a) and (b) therefore applies. Accordingly, the total offense level is 25.

The Defendant has no criminal history points and a corresponding Criminal History Category of I. *Id.* §4A1.1(d); *id.* Ch. 5, Pt. A.

Based upon the calculations set forth above, the Defendant's stipulated Guidelines imprisonment range is 57 to 71 months. *Id.* As the offenses are Class C felonies, the Guidelines range for a term of supervised release is one to three years. *Id.* §5D1.2(a)(2). Since the applicable Guideline range is in Zone D of the Sentencing Table, Kogan is ineligible for probation. *Id.* § 5B1.1, comment n.2. The fine range for these offenses is from $20,000 to $5,775,702. *Id.* §5E1.2.

Costs of prosecution shall be imposed on Defendant as required by statute. *Id.* §5E1.5. In determining whether to impose a fine and the amount of such fine, the Court shall consider, among other factors, the expected costs to the

Government of any term of probation, or term of imprisonment and term of supervised release imposed. *Id.* §5E1.2(d)(7) and 18 U.S.C. §3572(a)(6). These costs may include drug and alcohol treatment, electronic monitoring, and/or contract confinement costs. The most recent advisory from the Administrative Office of the U.S. Courts, dated August 1, 2018, provides a daily cost of $99, a monthly cost of $3,025, and an annual cost of $36,300 for imprisonment.

## The Remaining Factors of 18 U.S.C. § 3553(a)

Having engaged in the Guidelines analysis, this Court also gives due consideration to the remaining factors identified in 18 U.S.C. § 3553(a) to impose a sentence "sufficient, but not greater than necessary," as is required by the Supreme Court's decision in *Booker*, 543 U.S. 220, and the Second Circuit's decision in *Crosby*, 397 F.3d 103. In light of the Court's statutory responsibility "to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 102 (2007) (quoting 18 U.S.C. § 3553(a)), having considered the Guidelines and all of the factors set forth in § 3553(a), and having reviewed the PSR, the Court will impose a sentence within the Guidelines range.

**The Sentence**

For the instant offenses, Ilya Kogan shall be sentenced to
60 months' imprisonment. The term of imprisonment shall be
followed by three years of supervised release on each count, to
run concurrently. 18 U.S.C. § 3624(e). As mandatory conditions
of his supervised release, the Defendant shall:

(1) Not commit another federal, state, or local crime.

(2) Not unlawfully possess a controlled substance.

(3) Refrain from any unlawful use of a controlled
    substance. Defendant must submit to one drug test
    within 15 days of release from imprisonment and at
    least two periodic drug tests thereafter, as
    determined by the Court.

(4) Cooperate in the collection of DNA, as directed by the
    probation officer.

The standard conditions of supervision (1-13) apply with
the following special conditions:

(1) The Defendant shall be supervised by the district of
    residence.

(2) The Defendant will participate in an outpatient
    treatment program approved by the United States
    Probation Office, which program may include testing to
    determine whether the Defendant has reverted to using

drugs or alcohol. The Defendant must contribute to the costs or services rendered based on his ability to pay and the availability of third-party payments. The Court authorizes the release of available drug treatment evaluations and reports, including the presentence investigation report, to the substance abuse treatment provider.

(3)     The Defendant must submit his person, residence, place of business, vehicle, and any property or electronic devices under his control to a search on the basis that the probation officer has reasonable suspicion that contraband or evidence of a violation of the conditions of the Defendant's probation/supervised release may be found. The search must be conducted at a reasonable time and in a reasonable manner. Failure to submit to a search may be grounds for revocation. The Defendant must inform any other residents that the premises may be subject to search pursuant to this condition.

(4)     Unless in compliance with the installment payment schedule, the Defendant must not incur new credit charges or open additional lines of credit without the approval of the probation officer.

(5)     The Defendant must provide the probation officer with access to any requested financial information.

It is further ordered that the Defendant shall pay to the United States a special assessment of $300, which shall be due immediately.

The Court finds that the following agencies have suffered injuries compensable under the Victim and Witness Protection Act in the amounts indicated:

| Victim | Amount of Loss |
| --- | --- |
| Medicare | $1,073,264 |
| Medicaid | $223,736 |
| Geico | $251,372 |
| Liberty | $42,479 |
| **Total** | **$1,590,851** |

Forwarding addresses and contacts to whom payments should be sent has not been furnished by the Government to date. If necessary, receipt of this information may be deferred for a maximum of 90 days after sentencing, in accordance with 18 U.S.C. § 3664(d)(5) and (e). It is ordered that the Defendant make restitution to such agencies totaling $1,590,851, except that no further payment shall be required after the sum of the amounts actually paid by all defendants has fully covered all of the compensable injuries. Any payment made by the Defendant must be divided among the persons named in proportion to their compensable injuries.

If the Defendant is engaged in a BOP non-UNICOR work program, he must pay $25 per quarter toward the criminal financial penalties. However, if the Defendant participates in the BOP's UNICOR program as a grade 1 through 4, he must pay 50% of his monthly UNICOR earnings toward the criminal financial

penalties, consistent with BOP regulations at 28 C.F.R. §545.11. Any payment made that is not payment in full shall be divided proportionately among the persons named. The balance of the restitution must be paid in monthly installments of 20-percent of gross monthly income over a period of supervision to commence 30 days after the date of the judgment or the release from custody if imprisonment is imposed. The Defendant must notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

The Defendant must forfeit to the United States his interest in all property that constituted or was derived from any proceeds obtained as a result of the offenses, including but not limited to a total of $1,590,851 in U.S. currency, and for which he is jointly and severally liable.

In light of the significant amount of restitution owed and the forfeiture order that will be imposed in this case, the Court concludes that the Defendant does not have the ability to pay a fine. The fine has therefore been waived in this case.

The Defendant is a good candidate for voluntary surrender. He has kept all court appearances and has been in

compliance with all terms and conditions of his pretrial

release. He is not viewed as a flight risk or danger to the

community.

It is so ordered.

**New York, NY**
**February** 17 **, 2019**

ROBERT W. SWEET
**U.S.D.J.**